MILLER v. MANHATTAN FIRE & MARINE INS. CO.

No. 4968.  Decided September 6, 1930.  (290 P. 937.)

542

*Fisher Harris*, of Salt Lake City, for appellant.

*Fabian & Clendenin*, of Salt Lake City, for respondent.

STRAUP, J.

This action was brought to recover on an insurance policy issued to the plaintiff by the defendant by the terms of which the defendant insured the plaintiff against a "wrongful conversion, embezzlement or secretion" of an automobile upon which the plaintiff held a chattel mortgage. The case was tried to the court, who on findings rendered a judgment in favor of the defendant. The plaintiff appeals.

The court in substance found that O. A. Parsons on July 7, 1928, executed and delivered to the plaintiff at Salt Lake

City, Utah, a chattel mortgage on an automobile to secure "his indorsement" on a promissory note executed and delivered by E. S. and Eleanor Rich to Parsons and by him indorsed to the plaintiff, and that the defendant at the same time issued to the plaintiff its policy of insurance insuring the plaintiff against loss of her security by any wrongful conversion, embezzlement, or secretion of the automobile in the possession of Parsons; that the policy, among other things, provided that:

"This company shall not be liable, neither shall the Assured file a claim, under this endorsement for any loss unless and until the Assured shall have made all reasonable efforts to locate the Purchaser, collect overdue balances, and repossess the automobile. If a claim made under this endorsement shall be based upon a fraudulent act of the Purchaser, the Assured shall promptly apply to the proper authorities for a warrant for the arrest of the Purchaser and render all reasonable assistance (not pecuniary) in the apprehension and prosecution of said Purchaser.

"Where the Assured has failed to collect overdue balance to repossess the automobile (after having made all reasonable efforts to locate the purchaser and to collect overdue balances and repossess the automobile as provided elsewhere herein) the Assured shall give immediate notice of loss to this Company as provided in the General Conditions of this Policy, and the date upon which such notice of loss is received by this Company shall, for the purpose of this insurance, be construed as the date of the loss."

The court further found that during the month of September 1928, Parsons, without the consent or knowledge of the plaintiff, left Salt Lake City with the automobile and traveled through the Northwest and "thence to Texas where he arrived in October 1928 and that his employer sent him to San Antonio, Texas, where he remained until April 15, 1928, (1929) and thereafter he was sent to Dallas, Texas," and that during all of that time the plaintiff did not know of the whereabouts of Parsons or of the automobile, "but made efforts to locate him"; that Parsons was employed by a paint company doing a "national business" in the sale of automobile paint and enamel, which fact was known to the

plaintiff; that at the commencement of the action the automobile was still in the possession of Parsons, that he had not disposed of his interest therein, had not actually or intentionally concealed the automobile, had committed no act of embezzlement, and had not wrongfully secreted or appropriated the automobile; that on October 3, 1928, the plaintiff mailed a letter to Parsons at his last known address at the Belvedere Apartments in Salt Lake City, Utah, declaring the whole of the note due for failure of interest payments and demanded a delivery of the automobile to the plaintiff, that no reply was received by her in response thereto, and that the automobile was not delivered to her as demanded; that the failure of Parsons to deliver the automobile demanded, and in view that the plaintiff by notice had accelerated the note and declared it due and payable, she became entitled to take possession of the automobile for the purpose of foreclosure, which, and the conduct of Parsons and the circumstances surrounding it, created a liability on the part of the defendant under the terms of the policy; that on or about October 6, 1928, the plaintiff notified the defendant of the loss, but no sworn claim or proof of loss was filed as required by the policy, and that the defendant had not waived the filing of a sworn claim or proof of loss, although it had waived the time of sixty days in which to file it; that some time in December, 1928, the defendant located Parsons and the automobile, and on December 28 notified the plaintiff thereof and requested her to co-operate in repossessing the automobile, and on January 14, 1929 (after this action was commenced) requested her to sign an application for a surety bond for the purpose of repossessing the automobile, but the plaintiff refused to do so and made no effort to repossess the automobile after the filing of the notice of loss with the defendant. Upon such findings the court adjudged that the plaintiff was not entitled to recover. Some of the findings by her assignment of errors are complained of by the plaintiff, and some by the defendant on cross-assignments.

The plaintiff especially complains of the findings that there was no wrongful conversion, embezzlement, of secretion of the automobile by Parsons; that no sufficient or proper proof of loss was filed as required by the policy; that the filing of a sworn claim or proof or loss was not waived by the defendant; and that the plaintiff failed to co-operate with the defendant in locating and repossessing the automobile. It is plaintiff's contention that such findings are not sufficiently supported by and are against the evidence. The defendant disputes that and complains of the finding that the plaintiff was entitled to take or have possession of the automobile for purposes of foreclosure, and that the failure of Parsons to deliver the automobile to the plaintiff on demand for failure to pay the interest on the promissory note entitled the plaintiff to take possession of the automobile or created a liablity on the part of the defendant under the terms of the policy.

The plaintiff throughout all of the transaction was represented by her husband, who did all of the business and acted for her. We thus refer to her as Miller. The substance of the material portion of the evidence relating to the questions presented without substantial dispute is:

Miller was requested by the Packard Motors Company, dealing in and selling automobiles, to purchase a promissory note executed and delivered to Parsons by the Riches in the sum of $3,504, dated July 2, 1928, payable in one year with interest at the rate of 7 per cent per annum payable quarterly. The note provided that if the interest was not paid as by its terms specified the holder had the right to declare the principal due and to recover both principal and interest. The note was secured by a second mortgage on real property in Salt Lake City. Miller declined to purchase the note on the ground that the security, being a second mortgage, was worthless; the first mortgage being in the sum of $4,000. With moneys obtained from the sale of the note Parsons was desirous of purchasing an automobile from the Packard Motors Company. Miller finally agreed to purchase the

note if Parsons gave him a chattel mortgage on the automobile purchased by him as additional security for the payment of the note. That was done, the note transferred and indorsed to Miller and the chattel mortgage given, which, among other things, provided that the automobile was not to be *removed from Salt Lake County, Utah,* and that if default was made in the payment of the note, as by its terms provided, or if a sale or removal of the mortgaged property was made or attempted, the mortgagee was given the right to take immediate possession of the automobile wherever found and to proceed with a foreclosure of the mortgage.

In the mortgage the residence of Parsons is stated to be in Salt Lake City, Salt Lake county, Utah; and the evidence without substantial dispute shows that his then residence was represented by him to be in the Belvedere Apartments in Salt Lake City. Some time after the purchase of the automobile and the execution and delivery of the chattel mortgage, Miller received information that Parsons had left the city. Miller thereupon called at the apartments where Parsons and the Packard Motors Company had told him Parsons resided, and learned that Parsons had gone and that his whereabouts was unknown. Miller immediately notified the manager of the local agency of the defendant at Salt Lake City that Parsons had gone, that it looked suspicious, and requested the local manager to notify the defendant at once and to send word to Dallas, Tex., where Parsons formerly lived, and ascertain if he were there. The local manager informed Miller that he had done so and received a reply that Parsons was not there and that his whereabouts were unknown. Thereupon Miller on September 13, 1928, wrote the defendant at its home office at San Francisco, and after reciting that Parsons on or about June 29 had purchased a Packard car, giving a description of it, from the Salt Lake agency, and giving as payment therefor a note signed by the Riches and indorsed to and held by Miller and secured by a chattel mortgage on the car with

the usual provisions, and that at the same time the defendant issued its policy of insurance to Miller covering loss of the car by embezzlement, stated that Miller was informed that Parsons after closing the transaction left the state of Utah, traveled in the Northwest, returning through Yellowstone Park, and was last heard from at Cheyenne, but was further informed that Parsons was headed for Dallas, Tex.; that the interest on the note would be due the latter part of the month, and that Rich said he had no intention of paying either the note or the interest, Rich claiming that Parsons had defrauded him, and that Miller would therefore be compelled to look to the car for payment of the note; that it was thought Parsons had no intention of returning to Utah with the car, in which event the conditions of the insurance policy would be violated and that Miller would be compelled to look to the defendant for the payment of all damages sustained through the loss of the car; and that Miller felt it his duty to advise the defendant of such facts so that it could take steps to locate the car. A copy of the letter was also sent to the defendant's Salt Lake City agency. In reply, the defendant on September 18, 1928, requested the plaintiff to give the defendant the policy number covering the automobile in question. Miller on September 20th furnished that.

On September 22, 1928, Miller, by registered letter addressed to Parsons at his apartments in Salt Lake City, notified him that the three months' interest on the note was $61.32 and would become due on October 2, 1928, and requested payment thereof at that time. He also notified the Riches to the same effect. The registered letter sent to Parsons was not returned to Miller. On October 3, 1928, Miller further wrote Parsons at his residence at the apartments in Salt Lake City, notifying him that he on September 22 had given notice by letter addressed to his apartments calling his attention to the interest due on the note and that he had failed to hear from him or receive the interest, and that under the terms of the note the whole amount at his

option became due, and that he now declared the whole amount due, and demanded the delivery to him of the automobile, describing it, or the payment of the whole amount due on the note. Not anything came from that, no part of the note either of interest or principal was paid, and no delivery made of the automobile.

On September 26, 1928, the defendant wrote Miller—in re policy No. 7396, O. A. Parsons—that:

"We have this day notified the Pacific Coast Automobile Und. Conference of a possible embezzlement claim under this policy. We are handing you herewith form for reporting an embezzlement loss, and would ask that you kindly complete the same, returning to us at your very earliest convenience. Any additional information with which you might furnish us, and which might assist us in locating either the vendee or the automobile, would be apreciated."

In reply to that Miller on October 3, 1928, wrote the defendant:

"I enclose herewith *claim for embezzlement of the automobile fully described in the claim.* On September 13th I gave your Company preliminary notice of facts coming to my attention, which indicated an attempt to embezzle the auto described, and have since complied with your requests for all information.

"The note secured by the chattel mortgage referred to provided that the payee might declare the whole indebtedness due upon default in the payment of interest, and accordingly demand of payment was made and refused, and I have declared the entire indebtedness due, and am now making timely demand for payment. I trust you will give this matter prompt attention." (Italics added.)

Inclosed with that was the "form for reporting an embezzlement loss" sent Miller by the defendant, completely filled in and made out as by the form indicated and as sent to Miller for the purpose, giving the name and the address of the plaintiff, the Packard Motor Company of Salt Lake and its address, as the dealer (O. A. Parsons and his address at Belvedere Apartments, Salt Lake City, as the vendee, the make of the automobile, the motor and serial numbers, the type of body, model and license number, the color of the

body, wheels, and top of the car, the date and place of embezzlement, the giving of the chattel mortgage as security for the note, and the amount due and unpaid thereon. The blank so filled out and mailed to the defendant was properly signed but was not sworn to. The form as sent to Miller by the defendant contained no jurat, nor was any attached thereto. Miller filed out the form and signed it just as it was sent to him by the defendant. The defendant in due course of mail received the claim so filled out. No objection was made by the defendant that the report or claim was not sworn to or verified nor was there any suggestion made that the claim or report lacked anything which Miller was required to give, or that the claim as reported and made out was wanting or was insufficient in any particular. When received, the claim was sent by the defendant to the Pacific Coast Automobile Underwriters' Conference at San Francisco, and was marked or indorsed by it, "Loss Dept." It was Miller's contention that under the policy he was not required to furnish a sworn claim or proof of loss, a matter presently to be considered. However, when he filled out the form of the claim or loss sent him, he inquired of the man in charge of the local agency of the defendant at Salt Lake City and was informed by him that a sworn proof of loss was not required, nevertheless Miller offered to verify the claim or make a sworn proof of loss, but the man in charge of the local agency told him that was not necessary. Hence, no sworn proof of loss was rendered.

Miller first learned of the departure of Parsons from Salt Lake City through attorneys for the Riches, and who informed him that they had spent two or three weeks trying to locate Parsons; that they had chased him all over the country, but were unable to locate him. A representative of the Pacific Coast Automobile Underwriters' Conference called on Miller and told him that the matter had been referred to him and that he had charge of everything, and asked Miller to furnish him a copy of the mortgage and note and a copy of the certificate issued by the state of

automobile ownership, and to give the Pacific Coast Automobile Underwriters' Conference written authority to seize the automobile. All that was furnished and given by Miller.

Not hearing anything more of the transaction, Miller, on December 13, 1928, wrote the defendant that:

On the 3rd day of October 1928 I made a claim on your company for embezzlement of automobile by O. A. Parsons under policy No. A—7396 dated July 7th, 1928, for $2,115.00, Date reported to Theft Bureau Sept. 13th, 1928.

"This claim became delinquent on the 5th day of December 1928 as I understand, but as yet I have failed to receive any information or settlement from you, and which I now demand.

"Please let me hear from you at once, that I may know where I am."

That, in due course of mail, was received by the defendant on December 15, and was referred to the "Loss Dept." The defendant, however, made no reply thereto until December 28, 1928, when it wrote Miller that:

"Replying to yours of the 13th inst., *in connection with embezzlement claim reported under our Policy as above captioned*, please be advised that this automobile has been located in possession of Mr. Parsons at San Antonio, Texas, which is apparently his permanent place of business at this time. In accordance with the authority given to the Pacific Coast Automobile Underwriters Conference by your office they have endeavored to secure possession of the automobile, however, Mr. Parsons up to this time has *refused to willingly relinquish possession of the car*. The representatives of the Pacific Coast Automobile Underwriters Conference at San Antonio, Texas, are still endeavoring to secure possession of the automobile, and just as soon as this action is taken, we will be pleased to notify you accordingly." (Italics added.)

That was the first information the plaintiff or her representative had as to the whereabouts of Parsons or of the automobile. Nothing further was heard on the matter, so on January 11, 1929, the plaintiff commenced this action against the defendant by issuing a summons, which on January 12 was served on the defendant's local process agent. On January 14, 1929, and before Miller received the telegram from the defendant of even date presently to be

noted, she wrote and mailed the defendant a letter to the effect that the plaintiff had just been requested by the National Automobile Theft Bureau to apply to the United States Fidelity & Guaranty Company for a $7,000 replevin bond in order to replevin from O. A. Parsons the automobile described in the defendant's policy No. A-7396; that the representative of the Theft Bureau would not state that the request was made by the defendant's authority, that Miller was unable to see why the defendant desired a bond as large as $7,000 as the property involved did not exceed in value the sum of $2,500, and that Miller ought not to be required to put up any bond in the matter as that ought to be attended to by the defendant; and that *as ninety days had elapsed since the defendant received written notice of all matters connected with the claim,* and that a substantial time had elapsed since locating the embezzled automobile, Miller felt the defendant ought either to make payment, or on its own responsibility return the car without further delay.

After such letter was written and mailed, Miller received the following telegram from the defendant, dated January 14, 1929 (two days after the summons was served) :

"National Auto Theft Bureau advises you will only consider signing bond for repossession Parsons automobile if authorized by us. *We feel no embezzlement committed account terms and conditions of mortgage and your permission granted to vendee to remove automobile.* We have endeavored to cooperate with you in securing automobile for your protection, would suggest you sign bond and advise us when you have done so and will continue co-operate in an endeavor to secure machine or balance due you." (Italics added.)

In reply to the telegram, Miller on the next day wrote the defendant acknowledging the receipt of the telegram, and referring to its contents stated that his attitude with respect to the bond was made clear in his letter "of yesterday," and further stated that:

"The National Auto Theft Bureau was not her representative. If it is yours in this matter then the situation may be quite different.

You say 'we feel no embezzlement committed account terms and conditions of mortgage and your permission granted to vendee to remove automobile.' It would be interesting to know what terms or conditions of the mortgage you refer to and what you assume, contrary to the fact, that any permission was granted to the vendee to remove the automobile. In addition to which it is a rather late date to announce that you feel that no embezzlement was committed, and it is peculiar that you account for the feeling by the recital of facts which do not exist. * * * You have already received complete and timely notice of the facts on which this claim of loss is based. The vendee named in your policy gave as his permanent address the Belvedere Apartments in Salt Lake City, Utah, and reported that he would maintain the property here. Very shortly thereafter, and under a cloud of various complaints, civil and criminal against him, he disappeared and has not since been heard from, and the note the chattel mortgage was given to secure is past due. The security is not available and Parsons cannot be found. You say that he and the automobile described in the policy have been found some place in Texas. That may be so but it is of no avail to the insured. We secured the policy to guard against the possibility of just such a situation. * * * I wrote your company some weeks ago and in response to their ignoring my letter I have caused to be served a summons upon your company which has been returned by the sheriff."

In reply thereto, the defendant on January 16 acknowledged the receipt of the letter, referred to its telegram of January 14, and stated that it had not heard anything further "as to the final action taken, relative to the signing of the bond." It further stated that it had endeavored to cooperate in every way in securing the possession of the automobile, but that if the action requested in its telegram was not complied with "by Mr. Miller or by Annie M. Miller, the vendor under our contract, it will become necessary for use to withdraw our support."

The principal business of the defendant, and as its corporate name indicates, relates to "fire and marine insurance." It has a printed form of policy for such purpose. As provided by such form, the enumerated perils insured against are loss of property by fire, loss of property while being transported in a conveyance on land or water result-

ing from stranding, sinking, collision, etc., and loss from theft, robbery, and pilferage. In such printed form numerous conditions are stipulated as prerequisites to liability; among them, that "in the event of loss or damage, the assured shall give forthwith notice in writing to this Company; and within sixty (60) days after such loss, unless such time is extended in writing by this Company, shall render a statement to this Company signed and sworn to by the Assured, stating the place, time and cause of the loss or damage, the interest of the Assured and of all others in the property, the sound value thereof and the amount of loss or damage thereon," etc. The regular printed form of policy did not include a peril or perils, such as were here insured against. However, to cover and include them the defendant had a printed page, the heading of which is, "Wrongful Conversion, Embezzlement or Secretion Coverage," and in which, when filled out, stated the name of the assured, the consideration and amount of premium to be paid, the perils insured against, being the perils of "wrongful conversion, embezzlement or secretion by the mortgagor, purchaser, lessee or other person in lawful possession of the insured property under a mortgage, conditional sale, lease or other written contract or agreement," a description of the automobile, the name of the dealer from which it was purchased, the name of the purchaser, the date of delivery, the net cash sale price of the automobile and the amount of the unpaid balance, conditions as to registration of the automobile, requirements as to recordation of the mortgage, conditional sale contract, etc., conditions as to giving notice of loss and the filing of a claim and with respect to the defendant's liability, among which are the conditions set forth by the trial court in his findings, a provision that "the assured without written consent of this company previously given shall not make any settlement with or for the account of the purchaser, except at his own cost," and that "upon filing of a claim under this endorsement, whether loss ensues or not, all further insurance under this endorsement

covering on the property for which claim is filed, shall immediately cease and terminate, and the premium thereon shall be earned in full." The page consists of about fifty-six printed lines of about twenty words in each line. It purports to be and contains all of the essentials of a completed contract with respect to the perils insured. It was signed by the defendant and countersigned at Salt Lake City by the Reno Finance Corporation, the defendant's local agency at Salt Lake City and with whom Miller transacted the business of the insurance. Such printed page was pasted on and attached to the regular printed form of the defendant's insurance policy, which also was signed by the defendant and countersigned at Salt Lake City by the Reno Finance Corporation. The defendant calls the attached page a mere "rider." It manifestly is something more than that, and in reality constitutes the contract of insurance, and without it there would be no contract with respect to the subject and conditions of insurance contemplated by the parties.

As is seen, the trial court, on findings that Miller had failed to file a "sworn" statement or proof of loss and that such requirement was not waived by the defendant, together with other reasons, denied recovery. It is the contention of Miller, and denied by the defendant, ■■ that by the language of the policy relating to the perils against which he was insured, he in giving notice and filing a claim with respect to such a loss was not required to furnish a "sworn" statement of loss as a condition precedent to liability, and that the provision in such respect in the printed form of the policy relating to fire and marine insurance did not apply, or must give way to the language in the portions of the policy relating to a loss arising from a peril against which Miller was insured. The only provision in such portion of the policy is that the assured "shall give immediate notice of loss to this company as provided in the General Conditions of this Policy." The general condition of the policy in such respect pro-

vided that "in the event of loss or damage the assured shall give forthwith notice thereof in writing to this company." In such respect the two clauses are alike. But the general provision further provides that "within sixty days after such loss, unless such time is extended in writing by this company," the assured "shall render a statement to this company signed and sworn to by the assured." stating the time, place, and cause of the loss or damage. There are a number of provisions of the so-called general policy which are applicable and suitable in a policy insuring against perils for which the form of the general policy was prepared and intended, but which manifestly have no application to a loss arising from a peril against which Miller was insured. Some confusion arises as to the two clauses referred to, because of the manner in which the policy was prepared and put together by the defendant. The policy being prepared by the defendant and consisting wholly of language employed by it, whatever ambiguity there is with respect to it must be resolved against the defendant. If the defendant intended that an assured or the plaintiff was required, not only to give "immediate notice of loss" as by the "general conditions" of the policy provided—forthwith notice in writing—but also and in addition thereto "render a statement to this company signed and sworn to by the assured," the defendant well could have said so and well could have provided that not only immediate notice of loss be given, but also that a sworn statement be rendered, as by the general conditions of the policy provided. The defendant specifying the one requirement and not the other, it may well be assumed it intended only the one and not the other. In such view, the plaintiff in such respect did all that was required.

However, it is not necessary to rest the point there. Though the plaintiff was required to furnish a sworn or verified statement of loss or damage, yet we think it clear that the defendant waived such requirement and that the

court erred in finding and holding to the contrary. The plaintiff having written the defendant of the conditions and circumstances as stated in her letter of September 15, in effect that Parsons had departed from the state and had no intention of returning with the car and that plaintiff would be compelled to look to the defendant for payment of all damages sustained through the loss of the car, the defendant in reply requesting policy number covering the automobile, which immediately was furnished and on September 26 writing the plaintiff, "we are handing you herewith form for reporting an embezzlement loss," which on the face of it was designated "report of embezzlement of automobile," asking the plaintiff to fill it out, to "complete the same," and return it to the defendant, which statement containing everything required by the general condition of the policy as to the rendition of a sworn and signed statement, except that it was not verified or sworn to, if therefore the defendant by the blank form sent the plaintiff intended that to be a *mere notice* of loss and nothing more and expecting it to be followed up by the rendition of a sworn statement, then the defendant's conduct in the matter was highly misleading, though it may not have intended it to be so. The statement as made gave the defendant all the information required by a sworn statement. No jurat was attached to the blank form so furnished the plaintiff by the defendant and on its face characterized to be a "report of embezzlement of automobile." In making out the statement Miller inquired of the manager or agent in charge of the local agency of the defendant whether it was necessary that the statement be verified, expressed a willingness to do so, but was told by the manager that a verification was not required and was not necessary. In sending the statement to the defendant Miller in his letter referred to the statement as "a claim for embezzlement of the automobile fully described in the claim," and referring to the letter of September 13, stated that the defendant thereby "was given preliminary notice of facts," which indicated

"an attempt to embezzle the automobile described" and that the plaintiff had since complied with the defendant's request for all information. In his letter of December 13 to the defendant he stated that on October 3 he had "made a claim on the company for embezzlement of automobile by O. A. Parsons under policy No. A-7396," that it had been reported to the Theft Bureau, that the claim became delinquent December 5, 1928, that he had failed to receive any information *or settlement* from the defendant, and that he now *demanded a settlement,* and in reply the defendant stated it had received plaintiff's letter of December 13 "in connection with embezzlement claim reported under policy" No. A.-7396, from all of which, it is clear that the plaintiff intended, and that the defendant knew he intended, the statement filled out and signed to be just as characterized by him and as it purported to be, a claim and settlement for the embezzlement of the automobile; and it is just as clear that the defendant itself so regarded the statement. Certain it is that from the correspondence between the parties and through the course of dealings had between them, both the plaintiff and the defendant regarded the statement as something more than a mere notice of loss. Both spoke of it and treated it as a *claim for settlement.* If under such circumstances the defendant thought that by the terms of the policy the statement required verification, and if it desired it to be verified, fair dealing on its part called for a request by it that the statement be verified. It made no such request or suggestion. It remained silent and lulled the plaintiff into a sense of security that he in such respect had done all that was required. In all of the correspondence and proceedings had between the parties, the defendant treated and regarded the statement as being all that was required of the plaintiff in such particular, and made no claim or contention whatever that no sworn or verified statement had been furnished, until it filed its answer. Even in its telegram sent the plaintiff two days after it had been served with summons, the defendant made

no such claim, but therein began molding a defense on the ground that *no embezzlement had been committed and that the plaintiff had permitted the automobile to be removed from the state;* and in its letter to the plaintiff two days thereafter, reiterated such grounds of defense and made a further contention that, unless the plaintiff procured a $7,000 replevin bond from the United States Fidelity & Guaranty Company, it would become necessary for the defendant to withdraw all support in securing possession of the automobile. The defendant, as the record shows, through its own efforts, through the efforts requested by it of the Pacific Coast Automobile Underwriters' Conference and of the National Automobile Theft Bureau, from September 15, 1928, was unable to locate Parsons and the automobile until December 28, 1928, and when he finally was located at San Antonio, Tex., he, on demand made for possession of the automobile by the Pacific Coast Automobile Underwriters' Conference to whom the plaintiff had given authority to seize and take the automobile, refused to surrender the possession of it; and because the plaintiff at the request of the National Theft Bureau failed to procure a $7,000 replevin bond, the defendant withdrew all further support, and now, among other things, urges that the statement of claim filed by the plaintiff was not verified. We thus, under all the circumstances, are of the opinion that if a sworn statement of loss was exacted by the policy, the requirement clearly was waived by the defendant, and that the court erred in finding and holding to the contrary.

The claim made and pleaded by the defendant that the plaintiff had permitted the automobile to be removed from the state is not supported by the evidence. It was stipulated that Parsons, if present in court, would testify that when he gave the chattel mortgage—"at the time of giving it"—he stated to Miller that his business required him to travel throughout the Northwestern and Southern States and that he "of course would have to take the car with him," and that Miller stated that "the only

stipulation was I should have the car back to Salt Lake City after the note became due July 7, 1929." Such testimony was objected to by the plaintiff because at variance with the written chattel mortgage. The objection was overruled, to which the plaintiff took an exception. We think the testimony was improperly received. It clearly varied the terms of the chattel mortgage in which Parsons agreed not to remove the automobile from Salt Lake County, and that if default be made in the payment of the note as by its terms provided, or if the removal of the automobile be made or attempted, the mortgagee was given the right to take immediate possession of it "wherever found, using all necessary force for that purpose."

However, to dispute the testimony, Miller and counsel for the plaintiff who was present when the mortgage was executed testified that no such statement was made; that a few days after the mortgage was executed and delivered, Parsons stated to them that he might have occasion to run the car out of the state, and asked Miller if he would consent to his doing so, and that Miller most emphatically told him that he would not, "that the car must remain in the state until the note is paid," and that Miller and conusel both told him "that he was not to remove the car from the state under any circumstances." The court made no finding on the point, but on the record we think only one finding was permissible, and that is that no permission was given Parsons to remove the automobile from the state. It was not claimed by Parsons that any such permission was given him either in writing or otherwise after the mortgage was executed and delivered.

Equally untenable is the claim made by the defendant and the conclusion reached by the trial court that Parsons had not committed any embezzlement of the automobile, or had wrongfully appropriated it, or had wrongfully secreted or concealed it. It in effect is argued that there was no embezzlement or conversion of the automobile by Parsons because it was not shown that he had

sold it or otherwise had disposed of or had appropriated any proceeds of sale; and that in law there could be no embezzlement or conversion by any mere use Parsons might have made of the automobile, even taking it out of the state in breach of the mortgage covenants, unless with the intention to deprive the plaintiff of his lien or to defeat it, which, it is urged, was not sufficiently shown. We have a statute (Comp. Laws Utah 1917, § 485) which provides that: "Any mortgagor, * * * of personal property who shall, during the time such mortgage remains in force, destroy, sell, conceal, or otherwise dispose of the whole or any part of the mortgaged property, or who shall remove the same or any part thereof from the state without the written consent of the mortgagee, * * * shall be deemed guilty of obtaining money under false pretenses, and, on conviction thereof, shall be punished by a fine not exceeding three times the value of the property described in the mortgage, or by imprisonment in the county jail not more than six months, or by both such fine and imprisonment." In determining whether on the record an embezzlement or conversion or secretion of the automobile was committed by Parsons, recourse must be had to the meaning and understanding in which such terms were considered and used by the parties. The cases cited by the defendant (*Seattle Dodge Service Co.* v. *Royal Ins. Co.*, 135 Wash. 524, 238 P. 568 and *Knutzen* v. *North British Insurance & Mercantile Co.*, 127 Wash. 650, 221 P. 339) in support of its claim that on the record no embezzlement or conversion was committed by Parsons do not, as we think, support its contention. Such cases relate to a state of facts different from those here involved. Parsons in removing the automobile from the state in breach of the mortgage and without the knowledge and consent of the mortgagee committed a crime. Making such use of the automobile was adverse and hostile to the rights of the plaintiff and in violation of the purpose for which the automobile was permitted to remain in the possession of Parsons and for which it was intrusted to him. Such con-

duct constituted an exercise of a dominion of the automobile which Parsons had not the lawful right to exercise. That it was a clear invasion of plaintiff's rights cannot be doubted. When Parsons removed the automobile from the state, all rights he had in and to the possession of it ceased. So, too, when in default of the interest payments of the note and for that reason the principal of the note was declared due and payable and demand made for the possession of the automobile and the refusal of Parsons to surrender it up. Though the removal of the automobile from the state without the knowledge or consent of the plaintiff may not technically be characterized embezzlement, yet it constituted a conversion by Parsons to his own use and benefit of plaintiff's interest in the automobile as represented by the chattel mortgage and was the kind of embezzlement and wrongful conversion contemplated by the parties and as expressed in the policy of insurance. Such was the conclusion reached in the case of *Piper* v. *Dennis* (Tex. Civ. App.) 274 S. W. 307, in considering a clause in an insurance policy similar to that here involved and on facts quite similar to those of the case in hand. But the case here more completely and effectively shows a wrongful conversion than was shown in the Texas case, for here the mortgagor after all his rights of possession to the automobile ceased, on demand made refused to surrender it up, and when finally located in Texas in the unlawful and wrongful possession of the automobile on demand continued to refuse to surrender possession of the automobile. That such refusal constituted a wrongful conversion may not be doubted. At no time after his departure and removal of the automobile shortly after the mortgage was executed did he notify or attempt to notify the plaintiff or any one interested in the note or mortgage or automobile of his whereabouts or of the location of the automobile, nor did he offer to pay even any part of the overdue and unpaid interest on the note or any part of the indebtedness the payment of which he secured by the chattel mortgage. Considering the whole of his conduct in the

premises evinces an intention on his part to defeat plaintiff's lien, if he could, when he removed the automobile from the state. Thus, the finding that no embezzlement, or wrongful conversion, or appropriation was committed, is, as we think, against the evidence and unsupported by it.

It further is urged that the mortgage was not made a part of the policy of insurance, that the defendant had no knowledge of its contents, and hence was not bound by any of the terms or provisions of the mortgage. Except that a copy of the mortgage was not attached to and made a part of the policy, there is not anything in the record to support the contention. The policy expressly provides that the assured was insured against the perils of a "wrongful conversion, embezzlement or secretion by the mortgagor * * * in lawful possession of the insured property under a mortgage," etc. In the policy the insured property is described as an automobile delivered July 7, 1928, by the Packard Motors Company, dealer, to O. A. Parsons, purchaser, "under a legally enforceable sale contract, chattel mortgage, or lien," etc., and that all legal requirements for the execution and recording of the conditional sale contract, mortgage, or lien had been complied with. The plaintiff, Annie M. Miller, was named as the assured, insuring her against the perils of a wrongful conversion, embezzlement, or secretion by the mortgagor, etc. By the pleadings it is alleged and admitted that on July 7, 1928, Parsons executed and delivered to the plaintiff a chattel mortgage on the automobile in question, and that on the same day the defendant by its policy insured the plaintiff against a wrongful conversion, embezzlement, or secretion of the automobile by Parsons. There is no evidence to show that the defendant had not full knowledge of all of the terms and conditions of the mortgage. The defendant certainly knew it was insuring the assured either as a mortgagee or as some kind of lienholder mentioned in the policy. The defendant had full opportunity to ascertain whether it was the one or the other. To ascertain whether

the plaintiff sustained a loss through an embezzlement or conversion of the automobile by Parsons, it was necessary to resort to the contractual relation between the plaintiff and Parsons, whether it rested on a chattel mortgage, conditional sale, lease, or other agreement, for all such were included in the policy. Whether the defendant did or did not have knowledge of the terms of the contractual relation existing between the plaintiff and Parsons, so long as such relation rested on one or more of the contractual relations mentioned in the policy, is not the essence of the matter. The essential thing in such respect is as to whether the party, Parsons, falling within the terms of the policy, made a wrongful conversion, embezzlement, or secretion of the automobile, and to ascertain that, the contractual relation existing between him and the assured had to be resorted to. We think the point not well taken.

Lastly, it is urged that the plaintiff had not fully complied with the terms of the policy, in that he had not made sufficient effort or used due diligence in locating Parsons and in obtaining possession of the automobile as by the policy he was required to do, and in such particular had not sufficiently co-operated with the defendant. In such respect the court found that the plaintiff had made efforts to locate Parsons; that he had no knowledge of his whereabouts until informed by the defendant that Parsons was in Texas; that the plaintiff refused to sign an obligation for a surety bond and made no effort to repossess the automobile after the filing of his notice of loss. In support of its contention the defendant points to the provision of the policy that he defendant was not liable, unless the assured made all reasonable efforts to locate the purchaser, to collect overdue balances and to repossess the automobile. As soon as the plaintiff was given information that Parsons had left Salt Lake City, he on inquiry at the residence of Parsons at the Belvedere Apartments learned that Parsons had gone and that his whereabouts were unknown. Parsons was traced through the Northwest, back to Chey-

enne, and from there headed for Dallas, Tex., where it was ascertained he formerly resided. Inquiry was made from the Riches and of their counsel, who also were interested in locating Parsons. By them the plaintiff was informed they had spent two weeks in unsuccessful attempts in locating him. The plaintiff immediately notified the defendant's agency at Salt Lake City, who at his request inquired at Dallas, Tex., and found that Parsons was not there and that his whereabouts were unknown. The plaintiff promptly in writing demanded of Parsons at his last known place of residence payment of the three months' interest due on the note. He also demanded it of the Riches. No part of it was paid, and thereupon the plaintiff sent a written notice to Parsons' last known place of residence declaring the principal of the note due and payable and demanded possession of the automobile. No part of either principal or interest was paid or at any time offered to be paid. Even up to or at the time of trial did Parsons or any one offer to pay any part of the interest or principal. The plaintiff in September notified the defendant of all the information possessed by him. The defendant brought to its aid the Pacific Coast Automobile Underwriters' Conference and the National Automobile Theft Bureau in locating Parsons. To the former the plaintiff at its request furnished copies of the note and mortgage and of the state certificate of automobile ownership and gave it written authority to demand and seize the automible. With all that, Parsons was not located until December 28, 1928. When located, he, on demand of the Pacific Coast Automobile Underwriters' Conference, refused to return the automobile or to surrender it up. He unlawfully and clandestinely removed the automobile from the state and at all times since refused to return it, or to surrender it up, or to pay, or offer to pay, any part of the unpaid interest or principal of the note. If Parsons had not before, he certainly made a clear conversion of the automobile when, on demand of the Pacific Coast Automobile Underwriters' Conference who

were authorized to demand and receive the automobile, he refused to surrender it up or to return it. Under the circumstances, any further demand made of Parsons by the plaintiff after he learned of the location of Parsons, for the possession of the automobile, would have been unavailing. Thus up to the time of the request made of the plaintiff by the National Automobile Theft Bureau for a replevin bond in the sum of $7,000, we do not well see what more the plaintiff could have done, either in locating Parsons or in regaining possession of the automobile, or in what manner the plaintiff could further have aided the defendant in such particular, or wherein he failed to co-operate with the defendant in locating Parsons or in obtaining possession of the automobile. On December 28, 1928, the defendant wrote the plaintiff that the representatives of the Pacific Coast Automobile Underwriters' Conference at San Antonio, Tex., "are still endeavoring to secure possession of the automobile and just as soon as this action is taken we will be pleased to notify you accordingly." Even up to that time not anything was indicated by the defendant that anything more was required of the plaintiff, or that he was required from thence on to take steps himself to regain possession of the automobile, or to further aid the defendant in so doing. And it was not until after this action was commenced that any request was made that the plaintiff furnish a replevin bond to reclaim the automobile. Further, we do not see anything in the policy, nor does the defendant point to anything therein, whereby the plaintiff, after he had given the Pacific Coast Automobile Underwriters' Conference written authority to demand and receive the automobile, was under obligation to furnish a replevin bond, even though the request had been made more timely, and especially not anything under all the circumstances disclosed by the record and after an action on the policy had been commenced.

This being a law action, we are not on the record authorized to make or direct findings or to render a judgment in the cause. We, finding, as we do, that the findings

of the trial court in the particulars indicated are not supported by the evidence and that the judgment ■ is erroneous, are authorized only to reverse the judgment and to remand the case for a new trial. Such therefore is the order. Costs to the appellant.

CHERRY, C. J., ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.